**UNITED STATES of America, Appellant,**

v.

**Jose ACOSTA a/k/a "Jose Diaz", "Agapito Velazquez".**

**UNITED STATES of America, Appellant,**

v.

**Manuel ACOSTA.**

**UNITED STATES of America, Appellant,**

v.

**Martha OVALLE.**

**Nos. 91–2071 to 91–2073.**

United States Court of Appeals, Third Circuit.

Argued Feb. 14, 1992.

Decided May 27, 1992.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Linwood C. Wright, Jr., Melissa H. Maxman (argued), Asst. U.S. Attys., Office of the U.S. Atty., Philadelphia, Pa., for appellant.

Richard A. Shore, Law Offices of Richard A. Shore, Philadelphia, Pa., for appellee, Jose Acosta.

Howard D. Popper, Popper & Yatvin, Philadelphia, Pa., for appellee, Manuel Acosta.

Alan L. Yatvin (argued), Popper & Yatvin, Philadelphia, Pa., for appellee, Martha Ovalle.

Before: GREENBERG, COWEN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case resulted when members of the Drug Enforcement Agency ("DEA"), the

Bureau of Alcohol, Tobacco, and Firearms and the Philadelphia police joined forces to arrest 63 individuals for drug marketing crimes. A team of five law enforcement officers, led by DEA Agent Allen, (collectively referred to as "officers") were directed to execute a warrant for the arrest of Carlos Santiago. The arrest warrant did not identify Santiago's residence. However, it was in an envelope that gave three possible addresses. The first was 522 West Venango Street in Philadelphia.

When the officers arrived at 522 West Venango Street at 6:00 a.m., they discovered that the address was for a three story, multi-unit apartment building located at the corner of West Venango and Randolph Streets. A side door of the building faced Randolph Street and permitted access to the apartments.

The officers questioned several passers-by to see if anyone recognized Santiago's photograph. None of those questioned recognized him. The officers then decided to approach the building at its side entrance on Randolph Street and to look for Santiago by starting with the first floor apartment. Special Agent Allen, the arrest team leader, instructed two officers to "cover the back" of the building in case Santiago was within and tried to escape. One of these two officers, Special Agent DeProsperis, climbed a fence enclosing the backyard on the Randolph Street side and positioned himself in the yard. The record does not disclose where the second officer was located.

After Agent Allen rang at least one of the doorbells on the outside to no avail, the officers found that the outside door was unlocked. Agent Allen, accompanied by the other officers at the front door, entered through that door into a hallway and knocked on the first floor apartment door. Allen announced that they were the police,

that he had a warrant and ordered the occupants to open the door. Thereafter the officers heard "scuffling" and "commotion" from within, as well as the sound of a toilet flushing. At about the same time, Agent Allen heard Agent DeProsperis yell from the backyard that the occupants were throwing "stuff" from the window into the backyard. Agent Allen understood the word "stuff" to be a street term for drugs. He and another officer reacted by breaking down the door and entering the apartment.

The officers found Jose Acosta, Manuel Acosta and Martha Ovalle ("defendants") inside.[1] They recovered drugs and paraphernalia that were in plain view in the bedroom and proceeded to conduct a protective sweep. The sweep revealed weapons, large sums of cash, and additional drugs and drug paraphernalia inside the apartment. Similar evidence of drugs was recovered in the yard outside of the bathroom window. Santiago was not on the premises. After obtaining a search warrant two days later, the police acquired additional evidence on the premises.

Defendants were indicted for conspiracy to possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1) and 846, and aiding and abetting with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Additionally, Jose Acosta was charged with violation of 18 U.S.C. § 924(c)(1) for the knowing and willful use of a firearm in relation to drug trafficking.

Defendants moved under Federal Rules of Criminal Procedure 12(b)(3) and 41(f) to suppress the evidence gained as a result of the allegedly unlawful search and seizure.[2] After two hearings, the court ruled in open court that it would grant defendants' motions to suppress based on its conclusion that the search violated defendants' Fourth

---

**1.** The district court found that the apartment was leased to Jose Acosta and Martha Ovalle. It further found that Manuel Acosta, an overnight guest, was entitled to a privacy interest in the apartment as well, citing *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The government does not attack the district court's conclusion that the constitutional arguments being made were available to all of the defendants. We, therefore, refer to the defendants collectively.

**2.** Defendants sought the suppression of all evidence obtained from the July 23 warrantless search, as well as evidence obtained pursuant to a warrant issued on July 25.

Amendment rights. 786 F.Supp. 494 (E.D.Pa.1992). The government appeals. The district court had jurisdiction under 18 U.S.C. § 3231, while we have jurisdiction pursuant to 18 U.S.C. § 3731.

## II. DISCUSSION

■ The district court sketched its conclusions in its recorded oral ruling. It did not point to any dispute of material historic fact and we cannot find on the record any such dispute. In addressing the arguments of the parties, we will rely on the record in narrating the historic facts.[3] Review of a district court's legal conclusions is plenary.

■ We turn, at the outset, to the language of the Fourth Amendment:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The warrant requirement guarantees our people the right of freedom from unwarranted government intrusion. *Payton v. New York*, 445 U.S. 573, 585–86, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980). It affords reasonable protection by permitting only a neutral and detached magistrate to review evidence and draw inferences to support the issuance of a search warrant. *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948). Thus, a basic principle of Fourth Amendment law is that warrantless searches and seizures inside a home are presumptively unreasonable. *Payton*, 445 U.S. at 586, 100 S.Ct. at 1380. We proceed to the merits with these rules in mind.

### A. The Entry into the Apartment Building

Defendants do not suggest that the arrest warrant was invalid. However, they do assert at the outset that the warrant did not authorize the entry into the apartment building to inquire about Santiago. Their argument is based upon the assertion that the hallway outside their apartment, in which they had an easement of access, was within their zone of privacy protected by the Fourth Amendment. They say that the illegal entry into the hallway constitutes an alternative basis to support a decision suppressing the evidence, although such an argument was rejected by the district court.

The government does not argue that the entry into the hallway was justified by the arrest warrant. Rather, it maintains that under the established facts and law, the defendants' privacy rights did not extend to the hallway. Thus, it contends that the officers' entry into the hallway was constitutional. The first issue, therefore, is whether defendants' Fourth Amendment interests extended to the hallway, rendering the officers' entry illegal.

The district court held that the officers were entitled to enter the building. In reaching its conclusion, it explicitly adopted the reasoning of *United States v. Holland*, 755 F.2d 253 (2d Cir.), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985). The defendant in *Holland* resided in a second floor apartment in a two-story house. The inner hallway served both the first and second floor apartments. The defendant was arrested when, in response to the doorbell, he went down to the outer door and opened it.

The court in *Holland* held that the arrest, which took place while defendant stood in the open doorway, did not occur within the defendant's zone of privacy. It came to this conclusion for three reasons. First, it analyzed cases in which the Supreme Court considered invasions of privacy involving apartments and hotels. Although the actual rooms occupied by the defendants in those cases were accorded the same protected status as single family homes, the Court consistently spoke of en-

---

**3.** The district court filed an untimely opinion. See Third Circuit Court Rule 8(4). However, it does not add anything of significance to the historic facts.

tries, intrusions and invasions taking place at the doors of the living quarters. *Holland*, 755 F.2d at 255 (*citing e.g., Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (police invaded home when they broke the inner basement apartment door); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (search began when officers entered the individual hotel rooms)). The *Holland* court also supported its "common sense" conclusion by reference to Congress' conception of a home in the National Prohibition Act, Publ. L. No. 66, 41 Stat. 305, 315 (1919), which prohibited warrantless searches in "private dwellings." This Act defined "dwellings" to include "the room or rooms used and occupied not transiently but solely as a residence in an apartment house, hotel, or boarding house."

Secondly, citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court concluded that only when the defendant has the right to keep a place private and subject to his exclusive control would reasonable expectations of privacy attach. *Holland*, 755 F.2d at 255. The defendant in *Holland* did not have the right to exclude others, nor did the record indicate that he had ever attempted to do so. Thirdly, the court noted that a rule designating commons areas as beyond individuals' zones of interest preserves police access to protect the tenants' actual homes. *Id.* at 256.

*Holland* continues to be an accurate statement of the law in the Second Circuit. *See United States v. Barrios–Moriera*, 872 F.2d 12 (2d Cir.) (officers' entry into common hallway of apartment building behind defendant-tenant who unlocked the door was constitutionally permissible), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989), *abrogated on other grounds, Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Reardon v. Wroan*, 811 F.2d 1025, 1027 n.

2 (7th Cir.1987) (holding that persons in hallways of fraternity house, unlike apartment buildings, are constitutionally protected because of greater expectation of privacy). The majority of the circuits have adopted the Second Circuit's approach.[4]

■ We find ourselves in agreement with the Second Circuit's analysis in *Holland* as applied to the facts here. It is undisputed that one of the officers turned the doorknob and found that the door was unlocked. Thus, the inner hallway was easily accessible to tenants, visitors, solicitors, workmen and other members of the public. On this record, defendants had no way to exclude anyone and, therefore, could not have reasonably expected their privacy to extend beyond their apartment door. *See United States v. Breland*, 715 F.Supp. 7, 10 (D.D.C.1989) (defendant's contention that he expected basement storage area to remain private was undermined by the fact that the room was not locked), *aff'd*, 918 F.2d 225 (D.C.Cir.1990). In addition, the officers did not resort to trickery, guile or force in order to enter the building. Indeed, they first rang the outer doorbells without receiving a response.

Our conclusion that there was no constitutional violation finds some support in this court's decision in *United States v. Dickens*, 695 F.2d 765 (3d Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983). *Dickens* involved, among other things, the seizure of guns which police officers found in the stairwell of an apartment building where one of the defendants was temporarily staying. The defendant sought suppression of the evidence on the ground that the search in the stairway was illegal. The circumstances of the officers' presence in the apartment building, the physical layout and whether the building was secured by a locked door are not revealed in the opinion. We held, however, that "[e]xpecting privacy in a building staircase accessible to other ten-

**4.** *See e.g., United States v. Perkins*, 286 F.Supp. 259 (D.D.C.1968), *aff'd*, 432 F.2d 612 (D.C.Cir.), *cert. denied*, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970); *United States v. Concepcion*, 742 F.Supp. 503, 505 (N.D.Ill.1990), *aff'd*, 942 F.2d 1170 (7th Cir.1991); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir.1977); *United States v. Cruz Pagan*, 537 F.2d 554, 557 (1st Cir.1976). We recognize that some other circuits take a contrary position. *See e.g., United States v. Carriger*, 541 F.2d 545 (6th Cir.1976); *United States v. Fluker*, 543 F.2d 709 (9th Cir.1976).

ants and the general public cannot be considered reasonable." *Id.* at 778.

Because defendants had no reasonable expectation of privacy in the common area, the officers were entitled to open the unlocked outer door and go into the hallway without regard to their possession of an arrest warrant. Certainly this is so given their objective of attempting to locate Santiago's apartment. Thus, the entry into the building did not violate defendants' Fourth Amendment privacy rights and, therefore, did not taint the subsequent seizure of evidence.

### B. The Announcement at the Apartment Door

Defendants claim that even if lawfully present in the hallway, Agent Allen resorted to trickery and subterfuge by knocking on the apartment door and announcing several times, "This is the police. Open the door. Let me in. I have a warrant." They assert that the "evidence observed by Agent DeProsperis in his backyard position near Appellees' bathroom window was a direct fruit of Agent Allen's unlawful conduct." Appellees' Brief at 36. We understand defendants to be arguing that the words employed by Agent Allen to announce the presence of the police impermissibly sought to obtain defendants' consent for the officers to enter the apartment. Our interpretation of their argument arises from their reliance on involuntary consent cases such as *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), *aff'd,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). The district court apparently concluded that the words used by the officer at the door were not improper and, thus, could not form the basis for finding a constitutional violation. In resolving this issue, we believe that our standard of review is plenary.

■ The words 'trickery' and 'subterfuge' are employed in the Fourth Amendment context to invalidate police conduct in situations where officers accomplished their objective through deceptive strategy. Defendants state that, "[c]learly, Agent Al-

len's intention was to mislead the apartment's occupants into believing that he had authority to enter the apartment, and was about to do so."

■ The Supreme Court pointed out in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), that the first step in evaluating alleged violations of the Fourth Amendment is "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Id.* at 137, 98 S.Ct. at 1723. We note at the outset that Agent Allen spoke truthfully in identifying himself and the others as police and in stating that he had a warrant. He made no other factual assertions. Although the words, "Open the door. Let me in," were stated in the imperative, rather than as a request, they cannot be construed as words of deception. In addition, because of the officers' lack of knowledge about who was inside, they could not have engaged in any pretextual conduct in order to gain access. We recognize that the words used did not fully inform the occupants of the nature of the officers' business with them, however, we cannot say that under the circumstances the announcement was an "unlawful" attempt to trick the occupants into letting police inside. No objective assessment of the officers' conduct at the door would permit a contrary conclusion.

In any event, the officers did not gain entrance by consent; the officers entered after kicking in the door. Thus, this case is distinguishable from those relied upon by defendants. In *Bumper,* the police announced their presence and stated that they had a search warrant. The occupants of the dwelling accordingly opened the door and permitted a search of the premises, unaware that the officers, in fact, had no warrant. The Court concluded that the "consent" to search was involuntary. As a result, the evidence obtained was suppressed as the fruit of an illegal search and seizure. Similarly, in *Johnson,* the court suppressed evidence obtained by officers who misrepresented their identities by giving fictitious names in order to gain admittance. *Id.* at 757. Thus, we conclude that

the involuntary consent cases fail to state any proposition of law that would support a determination that Agent Allen's language was unlawful.

■ To the extent that defendants' brief may be read to assert that it was Agent Allen's bad faith intent that made his conduct "unlawful," we also reject that theory. The Supreme Court agreed with the government's position in *Scott* that a law enforcement officer's "subjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional." *Id.,* 436 U.S. at 136, 98 S.Ct. at 1723. The Court held that the officer's failure to make good faith efforts to conduct a wiretap within the confines of the law did not, without more, establish a Fourth Amendment violation. *See generally,* 1 LaFave, *Search and Seizure* § 1.4 (2d ed. 1987).

■ We think that defendants' brief may also be read to assert that the officers' announcement impermissibly *created* an exigency by causing the defendants to throw drugs out the window.[5] If that were the case, it is true that the government would be unable to rely on the exigent circumstances to justify the forced entry. *United States v. Halliman,* 923 F.2d 873, 878 (D.C.Cir.1991); *United States v. Duchi,* 906 F.2d 1278, 1284 (8th Cir.1990). However, we have already concluded that the announcement was not unlawful. We agree with the Court of Appeals for the Second Circuit that "[e]xigent circumstances are not to be disregarded simply because the suspects chose to respond to the agents' lawful conduct by attempting to escape, destroy evidence, or engage in any other unlawful activity." *United States v. MacDonald,* 916 F.2d 766, 771 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). Thus, the officers' conduct did not impermissibly create the circumstances occurring thereafter.

After evaluating each theory fairly suggested by defendants' arguments on appeal, we agree with the district court that

the words used at the door did not give rise to any violation of defendants' rights.

## C. The Constitutionality of the Backyard Presence

Given our conclusion that the officers were lawfully in the hallway and lawfully announced their presence at the first floor apartment door, we must next confront defendants' contention that the forced entry into defendants' apartment was unconstitutional. Since the government concedes that "the officers did not have any reason to believe that Santiago was in the first floor apartment at 522 West Venango Street as opposed to one of the other apartments," their break-in cannot be justified by their possession of the arrest warrant. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Thus, as the government agrees, the officers' entry could only be justified under an exception to the search warrant requirement, such as the exigent circumstances doctrine. *See Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *United States v. Rubin,* 474 F.2d 262, 268 (3d Cir.1973) (reasonable conclusion that the evidence is being destroyed constitutes exigent circumstances), *cert. denied sub nom. Agran v. United States,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

The district court concluded that the scuffling noise and the sound of a toilet flushing in the apartment, standing alone, did not create exigent circumstances which would warrant the intrusion. It found, however, that exigent circumstances arose when Agent DeProsperis, in the backyard, alerted the officers at the apartment door of the occupants' attempt to clear the apartment of contraband by throwing it out the window. Defendants do not dispute this finding. Notwithstanding the existence of exigent circumstances, however, defendants argue that the forced entry was unconstitutional because of the officers' illegal presence in the backyard.

In addressing this argument, the district court first held that the "backyard is part

---

5. *See infra,* Part II–C at 1254–1255.

of the curtilage of the defendants' first floor apartment." Thus, it determined that defendants had an expectation of privacy in the backyard that was protected by the Fourth Amendment and was violated by the officers' entry into the yard. The court reasoned that, but for the unlawful entry into the curtilage of their apartment, the agent would not have observed the evidence being thrown from the window.[6] Thus, it held that the officer, having impermissibly placed himself in a position to observe the drugs caused the exigency to be created. The court thereupon held that the government could not rely on the exigent circumstances exception to the warrant requirement. On that basis, the district court ordered the evidence suppressed.

We begin our analysis by noting that the concept of curtilage "originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). In *Dunn,* the Supreme Court held that "the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual *reasonably may expect* that the area in question should be treated as the home itself." *Id.* (emphasis added). Thus, the "central component of the inquiry [i]s whether the area harbors 'intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Id.* (*quoting Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), *abrogated on other grounds, Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)); *see also California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986).

*Dunn* referred to four factors relevant to the curtilage inquiry:

[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139. Defendants claim that the district court correctly analyzed these factors to reach its conclusion that the defendants had a reasonable expectation of privacy in the backyard.

■■■■■■ We assume that the curtilage determination was one of fact and that we therefore review it by the clearly erroneous standard. *United States v. Hatch,* 931 F.2d 1478, 1480 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 235, 116 L.Ed.2d 191 (1991); *Hodges v. United States,* 243 F.2d 281, 283 (5th Cir.1957). We may overturn a finding of fact under this standard only when after reviewing the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The district court "concluded, applying the four [*Dunn*] factors" that the backyard was part of the first floor apartment's curtilage. We believe that, very broadly viewed, the district court complied with the requirements of Federal Rule of Criminal Procedure 12(e).[7] The court appears to have applied the *Dunn* factors as though they constituted the exclusive test. However, the Court said in *Dunn:*

We do not suggest that combining these [four] factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is

---

6. Because of the "L" shape of the building, the window from which the drugs were thrown was not visible from outside the chainlink fence.

7. Rule 12(e) provides in pertinent part: "Where factual issues are involved in determining a motion, the court shall state its essential findings on the record."

so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

*Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139–40. Thus, even assuming each of the four factors was supported by the evidence, we think mechanical application of them in isolation is inappropriate to determine curtilage.[8]

In the first place, the question before the Court in *Dunn* was whether the barn, located on defendant's property fifty feet from his ranch house, was *within* the curtilage of the house. In that context, questions about the defendant's use of portions of the land, fencing configurations and efforts to shield it from public observation were relevant to demonstrate the *extent* of the curtilage of the home. The more fundamental question here is whether the backyard constitutes curtilage of the first floor apartment at all.

In addition, although the *Dunn* factors also apply to determine extent-of-curtilage questions in urban areas, certain factors may be less determinative in a city setting because of the physical differences in the properties. *See Horton v. United States,* 541 A.2d 604 (D.C.App.1988) (determination will necessarily center on use made of area since fencing will be less significant than in rural area and it may be impossible to shield the area from observation). We believe that the weight of the factors is diminished further as applied to apartment dwellings. *See United States v. Romano,* 388 F.Supp. 101, 104 & n. 5 (E.D.Pa.1975) ("The concept of curtilage has been significantly modified when applied to a multiple dwelling."). It seems clear, for example, that "the configuration of the streets and houses in many parts of the city may make it impossible, or at least highly impracticable to screen one's home and yard from view." *Horton,* 541 A.2d at 608. This seems to be true here. In addition to the foregoing, tenants generally have neither

the authority nor the investment incentive to take steps to protect a yard from view by doing such things as erecting a solid fence or planting trees and shrubbery. Instead, the tenant generally takes the property as he finds it, with or without fencing or other types of obstructions in place. In this context, the *Dunn* factors are not as useful analytically as in other settings. Thus, we believe the above quoted language in *Dunn* permits us to examine the record to determine whether other undisputed facts are important to the curtilage issue and thus to the tenants' expectations of privacy in the backyard.

■ Whether these defendants can demonstrate an invasion of their own Fourth Amendment privacy interests[9] "depends not upon a property right in the invaded place but upon whether the person who claims the protection of the amendment has a *legitimate expectation of privacy* in the invaded place." *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430 (*citing Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) (emphasis added). Nevertheless, as this case demonstrates, property law is not irrelevant to the inquiry. As the Supreme Court stated in *Rakas,* "by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of privacy interests protected by that Amendment." *Id.,* 439 U.S. at 144 n. 12, 99 S.Ct. at 430–31 n. 12. Although emphasis on "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control," *id.* at 143, 99 S.Ct. at 430, as Justice Blackmun said, "[n]ot every concept of ownership or possession is 'arcane.'" *Rawlings v. Kentucky,* 448 U.S. 98, 112, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633 (1980) (Blackmun, J., concurring). Recent cases, therefore, reflect the Supreme Court's continued

---

8. If *Fixel v. Wainwright,* 492 F.2d 480 (5th Cir. 1974), can be read to reach a contrary result, we disagree with it.

9. The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978).

consideration of property interests in determining Fourth Amendment privacy interests. *See e.g. United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). With these considerations in mind, we turn to the record.

 The district court made no findings as to whether defendants' lease gave them any legal interest in the backyard. The record reveals no written lease. The landlord gave the only testimony as to a lease as follows:

> Q. [Government] Did you ever have an agreement with Jose Diez, [sic][10] either in the lease or any other kinds of agreement, as to who was allowed to go in the backyard?
>
> A. [Torres] No, we don't put—we don't state nothing on the lease or nothing.
>
> \* \* \* \* \* \*
>
> Q. [Counsel for defendant] ... you had an agreement with my client that he was permitted to use the backyard, right?
>
> A. [Torres] Yes, sir.
>
> Q. And no other tenants were permitted to use the backyard, is that correct?
>
> A. No, that was the only one.

It is thus undisputed on this record that the lease itself did not grant the defendants the right to use the backyard.[11] This aspect of the landlord-tenant relationship, therefore, does not support an expectation of privacy in the backyard on the part of the defendants.

It is true that, apart from the lease, the landlord gave the defendants permission to use the backyard. However, the right to grant permission to others remained with the landlord, had he desired to let the other tenants use the backyard, albeit through the gate. Furthermore, the landlord used the backyard freely, as did his employees. Indeed, the landlord stored his boat in the backyard. We therefore conclude on the undisputed facts that the fact that defendants had permission to use the yard did not create any legitimate expectation of privacy in it. Indeed, the findings of fact show that defendants made very little use of the backyard. Defendants' insubstantial privacy interest arising from their authorized but limited use of the yard renders the four *Dunn* factors of insignificant value on this record in deciding the curtilage issue.

After reviewing the entire record, under the clearly erroneous standard, we therefore are left with the firm conviction that the district court made a mistake[12] in finding that the backyard was a curtilage of defendants' apartment. It follows that defendants had no expectation that entitled them to Fourth Amendment privacy in the backyard. Thus, the events Agent DeProsperis observed from his vantage point in the yard created an exigency that justified the officers' forced entry into defendants' apartment.[13]

The orders of the district court will be reversed.

COWEN, Circuit Judge, dissenting.

This case presents a number of difficult Fourth Amendment issues and I join in the majority's resolution of all of them with the exception of the conclusion reached in Section II.B. I believe that the law enforcement agents who decided to conduct a "bottom to top search" of 522 West Venango Street created the exigent circumstances upon which they now rely to justify their warrantless search of the defendants'

---

10. Jose Acosta was also known by the name Jose Diaz.

11. The government did not challenge defendants' standing to file the motion to suppress and we, therefore, do not address it.

12. We would, *a fortiori,* reach the same conclusion were the issue of curtilage considered to be a legal one.

13. In view of our ultimate conclusion, we will not address the government's argument that the district court improperly excluded, as irrelevant, evidence tendered at the suppression hearing.

apartment. Therefore, I would hold that the evidence obtained from the yard behind 522 West Venango Street as well as the evidence found within the defendants' apartment should be suppressed as obtained in violation of the Fourth Amendment. I respectfully dissent from that part of the majority opinion which holds otherwise.

## I.

Before explaining why I find that the exigent circumstances exception to the Fourth Amendment has not been satisfied here, I believe a brief discussion of arrest warrants and the power they confer upon law enforcement officials is appropriate. A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute that warrant. *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). An arrest warrant does not give officers the authority to enter the home of a third person to execute the warrant; usually a search warrant for such a residence is required. *Steagald v. United States*, 451 U.S. 204, 215–16, 101 S.Ct. 1642, 1649–50, 68 L.Ed.2d 38 (1981). Courts which have addressed the issue have held that in order to lawfully enter a residence to execute an arrest warrant, the officer must have a "reasonable belief" that the subject of the warrant resides at the home to be searched. *See Perez v. Simmons*, 884 F.2d 1136 (1988), *modified*, 900 F.2d 213 (9th Cir.1990)[1]; *United States v. Ramirez*, 770 F.2d 1458, 1460 (9th Cir.1985); *United States v. Dally*, 606 F.2d 861 (9th Cir.1979); *Bratton v. Toboz*, 764 F.Supp. 965, 971–72 (M.D.Pa.1991). If no "reasonable belief" exists that the subject of the warrant can be found in a particular dwelling, a search warrant is needed to enter that dwelling absent some established exception to the warrant requirement.

The government here claims that its agents possessed a "reasonable belief" that Santiago resided at 522 West Venango Street. However, the facts of this case do not even vaguely resemble the facts established in those cases in which a "reasonable belief" has been found to exist. A "reasonable belief" has been found to exist where law enforcement agents had recently received reliable information that the subject of the warrant was currently residing at a particular address, *Bratton*, 764 F.Supp. at 972, had themselves observed the subject entering and leaving the residence in question with a key, *Harper*, 928 F.2d at 896; *Dally*, 606 F.2d at 862, or had verified through positive photo identification by neighbors that the subject resided at the place in question. *Ramirez*, 770 F.2d at 1459.

Here, law enforcement agents went to 522 Venango Street because court documents that were nearly nine months old indicated that 522 West Venango Street was Santiago's last place of residence. Those documents did not include an apartment number. When the agents arrived and discovered that 522 West Venango was a multi-unit dwelling they conducted no surveillance to determine whether Santiago still lived there, made no attempt to determine which apartment he lived in and, in fact, proceeded in the face of a completely negative response by neighbors who were shown Santiago's photograph for identification purposes.[2] In addition, at the suppression hearing, Agent Allen testified that including himself, five officers had been dispatched to execute the Santiago warrant. Agent Allen conceded that with such a number of agents both doors leading out of the building could have been guarded in order to ensure that Santiago did not leave the building and evade arrest. Moreover,

---

**1.** *But see United States v. Harper,* 928 F.2d 894, 896 (9th Cir.1991), in which the Ninth Circuit held that officers need "probable cause" to believe the subject of an arrest warrant resides in a particular place in order to enter that place to execute the warrant, rather than a "reasonable belief."

**2.** Indeed, Agent Allen testified that no one questioned had seen Carlos Santiago in the vicinity of 522 Venango Street that day, that month or in the first seven months of 1991.

these agents easily could have staked out the building to determine whether Santiago did, in fact, live there, despite neighbors' statements to the contrary, and in which apartment.

Despite an almost complete lack of knowledge as to whether Santiago lived in this particular building, and indeed having been told by neighbors that they had never seen him, the agents immediately decided to simply start on the ground floor of the building and work their way to the top in an effort to locate Carlos Santiago. Their first stop was the first floor apartment in which the defendants lived.

It is not absolutely clear what transpired when Agent Allen and his fellow officers arrived at the defendants' door. At the suppression hearing, Agent Allen agreed that upon reaching the door, he knocked and stated "Police, let me in" or "This is the police, open the door." One defense lawyer suggested the following to Agent Allen: "You said let me in. You had a warrant. Let me in, correct?" App. at 193. Agent Allen agreed that this is what he had said.

There can be no question but that the officers demanded that the defendants open the door to the apartment and misrepresented their authority to enter. Indeed, the majority seemingly agrees that the officers did not simply request entry, as it states that "Allen ... *ordered* the occupants to open the door," Maj. Typescript Op. at 1250 (emphasis added), and characterizes Allen's words as having been "stated in the imperative, rather than as a request." Maj. Typescript Op. at 1253.

There is also no doubt that the officers asserted an authority to enter the defendants' apartment which they simply did not possess. As noted by the majority, the officers had no knowledge as to who was inside the first floor apartment. Moreover, the officers clearly lacked a reasonable belief that Santiago lived in the first floor apartment and thus could claim no authority to enter on that basis. While their statement that they had a warrant was technically correct, I do not agree with the majority that we are confined to determining the technical truth of the officers' assertion. Clearly the officers here simply stated that they had a warrant in order to buttress their demand that the occupants of the apartment grant them entry.

Nevertheless, the majority upholds the legitimacy of the warrantless entry into the defendants' home by relying upon the exigent circumstances exception to the Fourth Amendment's warrant requirement. The majority finds the agents' entry justified based upon the throwing of drugs out the bathroom window of the first floor apartment. The majority concludes that because the agents' demand for entry was not "unlawful" it cannot be said that their demand for entry impermissibly created the exigency upon which they seek to rely. I do not agree.

While law enforcement officials have a right to conduct reasonable investigations into criminal activity, a plan by officers to demand entry into every apartment in a multi-unit dwelling in order to locate the subject of an arrest warrant is neither reasonable nor within the purview of Fourth Amendment teachings. Moreover, I do not agree with the majority that those cases dealing with involuntary or coerced consent to search have no bearing on the case presently before us. While this is not a case in which law enforcement officials gained access to the defendants' home through coercion or trickery, it is important to note that if the agents had gained entry through consent based on their demand, the consent would be deemed involuntary and suppression would be appropriate. *See United States v. Winsor,* 846 F.2d 1569, 1573 (9th Cir.1988) (no consent as matter of law where officers demanded entry under color of law); *United States v. Edmondson,* 791 F.2d 1512, 1514, 1515 (11th Cir.1986) (defendant's opening door following command of "FBI. Open the door." not voluntary consent to entry); *cf. United States v. Tobin,* 923 F.2d 1506, 1512 (11th Cir.1991) (en banc) (when government agent knocked on defendants' door for three to four minutes as he shouted in English and in Spanish, "I'm a police officer, I would like to talk to you, I need for you to come here," agent's

words were "in the form of a request" which the defendant was free to deny, and thus decision to open door was voluntary), *cert. denied,* —— U.S. ——, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991). Just as a baseless assertion of authority may not serve as the predicate to a finding of voluntary consent to entry, law enforcement agents may not rely on the exigency created by such an unjustified assertion of authority.

## II.

Where an exigency which would normally justify a warrantless entry is created by the government, the government cannot rely on that exigency. *United States v. Duchi,* 906 F.2d 1278, 1284–85 (8th Cir. 1990); *United States v. Timberlake,* 896 F.2d 592, 597 (D.C.Cir.1990); *United States v. Curzi,* 867 F.2d 36, 43 n. 6 (1st Cir.1989); *United States v. Webster,* 750 F.2d 307, 327 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 2341, 85 L.Ed.2d 855, 856 (1985); *United States v. Thompson,* 700 F.2d 944, 950 (5th Cir.1983). A number of courts have addressed the issue of when police may rely on exigencies which their own behavior appears to have created. In *Timberlake,* for example, the D.C. Circuit noted that once officers knocked on the door and shouted "police, open the door," those inside the apartment were likely to destroy evidence and thus an exigency which would justify warrantless entry did technically exist. 896 F.2d at 594. However, the court also cautioned that the "critical point [was] that there w[ere] no exigent circumstances justifying a police demand for admission, and subsequent entry, into Mrs. Timberlake's home without her permission." *Id.* at 597 n. 3. As a result, the court held that the police could not rely on the exigency created by their own conduct to justify the subsequent warrantless search.

Similarly, in *Duchi,* the police drastically altered a package of drugs being sent to the defendant and then delivered it to the defendant's home. In making a warrantless entry into the defendant's home, the police sought to rely on the exigent circumstances exception, contending that when defendant noticed the alteration of the package he would attempt to destroy the evidence contained therein. The Eighth Circuit rejected the claimed exigency as justifying the warrantless entry, holding that the danger of destruction, while real and while creating an exigency, was also reasonably foreseeable and had been created by the behavior of the officers. 906 F.2d at 1285.

In reaching its conclusion the court in *Duchi* noted that

in some sense the police always create the exigent circumstances that justify warrantless entries and arrests. Their discovery of the criminal causes him to flee, their discovery of the contraband causes the criminal's attempt to destroy or distort the evidence.

*Id.* at 1284. However, for that very reason, the court went on to note, when evaluating a claim that the police created the exigent circumstances upon which they seek to rely, the better inquiry is into the "reasonableness and propriety of the investigative tactics that generated the exigency." *Id.* In making this antecedent inquiry into the appropriateness of investigative tactics, the court stated that the "deliberate creation of urgent circumstances is unacceptable." *Id.* The court cautioned that "bad faith is not required to run afoul of the standard we adopt and apply today. As Justice Jackson noted, the danger to constitutional rights more often comes from 'zealous officers' rather than faithless ones." *Id.* (quoting *Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948)).

*United States v. Munoz–Guerra,* 788 F.2d 295 (5th Cir.1986), also bears some similarities to the present case. In *Munoz–Guerra,* the court pointed out that warrantless entry was a foregone conclusion the moment government agents revealed their identity to the defendant at his patio door. *Id.* at 298. Because of the likelihood that an exigency would arise when the presence of officers at the door was revealed, the court noted that the pertinent inquiry is "whether exigent circumstances justified the agents' initial decision to ap-

proach the patio door." *Id.* Finding that no such circumstances existed, the court determined that the warrantless entry was unreasonable.

Unlike other courts of appeals, the Second Circuit has taken a seemingly narrow view of when an exigency can be said to have been created by the government. *See United States v. MacDonald,* 916 F.2d 766 (2d Cir.1990) (in banc), *cert. denied,* — U.S. —, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *United States v. Zabare,* 871 F.2d 282 (2d Cir.1989), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989); *United States v. Cattouse,* 846 F.2d 144 (2d Cir.), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988). In *MacDonald,* the Second Circuit held that although the defendants' attempt to flee when officers knocked on the door and announced their presence constituted an exigency allowing warrantless entry, that exigency had not been created by the government even though the occupants' reactions were concededly foreseeable. 916 F.2d at 771. The majority explained its holding as follows

> Exigent circumstances are not to be disregarded simply because the suspects chose to respond to the agents' lawful conduct by attempting to escape, destroy evidence, or engage in any other unlawful activity. The fact that the suspects may reasonably be expected to behave illegally does not prevent law enforcement agents from acting lawfully to afford the suspects the opportunity to do so.

*Id.*

The dissent in *MacDonald* was not satisfied with this explanation, noting that agents had arrived at the defendants' door with a battering ram, "plainly anticipat[ing] that the announcement of their identity would precipitate an exigency." *Id.* at 776 (Kearse, J., dissenting). The dissent concluded that "[w]e should not endorse such contrivances by law enforcement officials in their efforts to circumvent the Fourth Amendment's warrant requirement." *Id.* I agree with the *MacDonald* dissent that even when the conduct of government agents may be termed "lawful," we must not countenance efforts to circumvent the warrant requirement. *See* Jacqueline Bryks, *Exigent Circumstances and Warrantless Home Entries: United States v. MacDonald,* 57 Brook.L.Rev. 307, 332 (1991) (criticizing Second Circuit's conclusion that officers' subjective intent is irrelevant to Fourth Amendment analysis as long as police may be said to have acted in objectively lawful manner).

In the present case, the majority concludes that because "the announcement was not unlawful," under the reasoning of *MacDonald* government agents cannot be said to have created the exigency upon which they relied and thus the evidence recovered need not be suppressed. This conclusion is unjustified for two reasons. First, as noted, Agent Allen did not act lawfully in demanding entry to the defendants' apartment because he asserted an authority to enter which he clearly did not possess. While the majority states that Agent Allen "spoke truthfully in identifying himself and the others as police and in stating that he had a warrant," even the majority grudgingly concedes that "the words used did not fully inform the occupants of the nature of the officers' business with them." Maj. Typescript Op. at 1253. Moreover, as is evidenced by their unjustified demand to enter, I think it clear that the agents' plan to start at the bottom and work their way to the top of the building was nothing more than an attempt to "smoke out" any wrongdoers, in other words, to create an exigency upon which the agents could then rely in conducting a warrantless search.

Because I agree with the majority of courts confronting this issue that we must look carefully at the facts of the particular case to determine how the exigent circumstances upon which the government seeks to rely came about, I would uphold the district court's order suppressing the evidence obtained. On the record before us I cannot agree that the plan to demand entry to every apartment at 522 West Venango Street was reasonable or proper. *See Duchi,* 906 F.2d at 1284 (court should look to reasonableness and propriety of investiga-

tive techniques used). In this case, agents were acting on information which was nine months old, clearly did not know which apartment Santiago lived in and did not bother to find out, and, in fact, had only received information that Santiago did *not* live in the multi-unit dwelling they found when they arrived at 522 West Venango Street.[3] Nevertheless, the agents entered the building and began executing their plan to work their way from the bottom to the top of the building, demanding entry into the homes of those who lived there.

This case presents a substantial danger to the constitutional rights of apartment dwellers who simply happen to live in a multi-unit dwelling in which the subject of an arrest warrant may have once lived. I would conclude that the reasonably foreseeable consequence of pounding upon an apartment door and demanding entry under color of authority is that the occupant will either feel compelled to consent to entry or will attempt to flee or destroy evidence, resulting in exigent circumstances. While recognizing that law enforcement officers are free to rely upon exigent circumstances which arise through no effort on their part, I do not think the exception can or should be extended to a situation such as the one before us. To allow law enforcement officials to rely on an exigency created by their own conduct, conduct which was not warranted or authorized by the situation, unwisely allows evasion of the warrant requirement, thereby violating the sanctity of the Fourth Amendment.

---

**3.** Indeed, as the agents later discovered, Carlos Santiago, the subject of the arrest warrant, did

not live in any apartment at 522 West Venango Street.