**UNITED STATES of America**

v.

**Glendon PORTER.**

**Criminal No. 05–648.**

United States District Court,
E.D. Pennsylvania.

July 13, 2006.

Joseph A. Labar, Philadelphia, PA, for Plaintiff.

Stuart Patchen, Philadelphia, PA, for Defendant.

## MOTION to SUPPRESS EVIDENCE FINDINGS OF FACT AND CONCLUSIONS OF LAW

RUFE, District Judge.

The Court herein enters the following findings of fact and conclusions of law after hearing on Defendant's Motion to

1. Doc. # 19.

2. Doc. # 19, 26.

3. Doc. # 21.

Suppress Physical Evidence and Statement,[1] and upon consideration of both Defendant's[2] and the Government's[3] memoranda of law.

## I. Findings of Fact

1. On September 29, 2005, a municipal court judge in the City of Philadelphia, Pennsylvania issued a bench warrant for the arrest (the "arrest warrant") of Glendon Porter ("Defendant") for Defendant's failure to appear in court on criminal charges arising out of a shooting in South Philadelphia.

2. On October 14, 2005, Philadelphia Police Detective Chris Marano ("Det.Marano"), a sixteen-year police veteran with extensive law enforcement experience in West Philadelphia, and other law enforcement officers went to Defendant's last known address, 1532 North 54th Street in West Philadelphia, to execute the arrest warrant.

3. There, Defendant's father told the officers that Defendant no longer resided at that address. Additionally, Defendant's father told the officers that Defendant resided in the vicinity of 56th Street.

4. On October 14, 2005, Det. Marano contacted a confidential police informant, knowledgeable about the neighborhood encompassing 56th Street and Landsdowne Avenue in West Philadelphia, to inquire about Defendant's whereabouts.

5. On October 17, 2005, the confidential informant telephoned Det. Marano and told him that Defendant could be found at 5515 Hunter Street in West Philadelphia residing with a female. Additionally, the informant told Det. Marano that if police found Defendant at that location he would be in possession of a firearm.[4]

4. At the suppression hearing, Det. Marano testified that he asked the confidential informant how he or she knew Defendant's whereabouts, but excluded that information from

6. Det. Marano then met briefly with the confidential informant and drove the informant past 5515 Hunter Street, while the informant was supine in the backseat of the unmarked police vehicle, so that the informant could identify the building where Defendant could be found. The confidential informant provided no information concerning the layout of the interior of the property located at 5515 Hunter Street.

7. Det. Marano also reviewed Philadelphia County's voter registration records and Pennsylvania's Department of Motor Vehicles' records for resident information for 5515 Hunter Street. Those searches yielded information about the residence's occupants (the records review did not suggest that 5515 Hunter Street was Defendant's address of record), but did not reveal information about the building's layout.

8. On October 19, 2005, Det. Marano submitted to Judge Amanda Cooperman of the Court of Common Pleas of Philadelphia County an affidavit of probable cause and an application for a search warrant for 5515 Hunter Street.

9. Det. Marano's probable cause affidavit contained the following facts: (1) Defendant was a fugitive wanted for failure to appear in court on a firearms charge; (2) Defendant's father told police that Defendant resided in the vicinity of 56th Street; (3) a confidential informant told Det. Marano that Defendant was "sleeping at 5515 Hunter Street" and would be in possession of a firearm at that address; (4) the confidential informant had provided information to police that resulted in multiple arrests, seizure of weapons, drugs, and other contraband; (5) the confidential informant had never provided faulty information to the police in the past; (6) the confidential informant was intimately familiar with the neighborhood encompassing 5515 Hunter Street; and (7) the confidential informant was involved in numerous other active investigations.

10. On October 19, 2005, Judge Cooperman issued a search warrant for 5515 Hunter Street. The search warrant describes the location to be searched as "a three story brick and masonry construction with the addres [sic] clearly marked."

11. At approximately 6:30 a.m. on October 20, 2005, at least ten members of the Violent Crime Impact Team ("VCIT members" or "team members"),[5] including Det. Marano, arrived at 5515 Hunter Street to execute the search and arrest warrants. Several team members approached the front door of the building with flashlights and firearms drawn, while other officers positioned themselves at the rear of the row home to prevent Defendant's escape.

his affidavit of probable cause to protect the informant's identity. The Court denied Defendant's oral motion to subpoena the informant's testimony concerning his or her basis of knowledge of Defendant's whereabouts because determination of the issue of probable cause is limited to review of the four corners of the probable cause affidavit itself. As such, information omitted from Det. Marano's probable cause affidavit has no bearing on the Court's determination of whether the issuing magistrate was provided substantial information to provide basis for probable cause. See *United States v. Conley*, 4 F.3d 1200, 1204 (3d Cir.1993) (citing *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir.1982) ("Whether the information in the affidavit establishes probable cause is a determination based solely on written evidence.")). Moreover, Defendant failed to establish during presentation of his oral motion the inapplicability of the government's privilege to maintain the anonymity of its confidential sources. See *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (identifying the scope of the so-called informer's privilege).

**5.** The VCIT is a combination of city and federal law enforcement officers working collectively to investigate gun crimes in Philadelphia.

Although there is a black intercom box on the porch positioned between the front door and the first-floor window with three white, rectangular buttons on it, team members failed to observe the intercom box when they arrived at 5515 Hunter Street.

12. Det. Marano knocked on the front door of the house and announced the presence of law enforcement officers and their intention to execute the search warrant for the premises.

13. A short time later, a woman came to the building's first floor window and asked why the officers were at the door.

15. Det. Marano told the woman through the window that the officers were there to execute a search warrant.

16. The woman then opened the front door of the house. Several officers entered the residence, some brandishing firearms, while several others remained on the front porch to prevent Defendant's escape.

17. Upon entering the residence, law enforcement officers realized, for the first time, that 5515 Hunter Street is not a single family home but a three-unit apartment house.

18. In the vestibule of the apartment house, Det. Marano again told the woman who opened the front door that they had a search warrant for the property and were looking for Defendant, identifying him by name.

19. The woman told Det. Marano that she did not know Defendant and that they could search her residence (Apartment A), which was the only apartment on the first floor of the building. The officers then searched her apartment.

20. The officers then proceeded up the lone staircase to the second floor of the apartment house. At the top of the staircase, the officers observed two closed doors—one directly in front of the staircase (Apartment B) and another to the right of the staircase (Apartment C). Team members then asked Det. Marano how to proceed. Det. Marano instructed them to knock on both doors and announce their presence and their purpose of executing the search warrant.

21. A short while later, a woman opened the door to Apartment C. No one came to the door of Apartment B. Det. Marano then told the woman who opened the door to Apartment C that the law enforcement officers had a search warrant and were looking for Defendant, identifying him by name.

22. The woman then looked back inside the apartment, gestured to the rear of the apartment with her arm, and fully opened the door to her apartment to let the officers inside.

23. Team members, brandishing firearms and flashlights, then entered the second floor apartment. Upon entering Apartment C, team members pointed their flashlights in the direction that the woman gestured down a short hallway to the apartment's dimly illuminated bedroom. In the bedroom, the officers observed a person under the bed with feet protruding from underneath the bedframe.

24. Team members then entered the bedroom with their guns drawn and ordered the person underneath the bed to show his or her hands and come out from underneath the bed. The person underneath the bed did not comply.

25. Det. Marano then moved past the other officers and lifted the bedframe to reveal Defendant laying on the bedroom floor. Defendant sprung to his feet and unsuccessfully attempted to run through the barricade of law enforcement officers.

26. The officers then took Defendant into custody and searched the bedroom. On a shelf in the bedroom closet, a team

member found a fully-loaded ten millimeter semi-automatic pistol.

27. After locating Defendant in the second-floor apartment and seizing the firearm in the bedroom closet, the officers discontinued their search of the building. Law enforcement officers then transported Defendant to the Philadelphia offices of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. There, Defendant was read his *Miranda* warnings, and later made an incriminating statement to law enforcement officers.

## II. Conclusions of Law

■ 1. Based on the totality of the circumstances, the judicial officer who issued the search warrant for 5515 Hunter Street had a substantial basis for concluding that probable cause supported issuance of the warrant. First, Defendant's father informed Det. Marano that Defendant resided somewhere in the vicinity of 56th Street. Second, Det. Marano received information about Defendant's whereabouts (including a first-hand identification of the building where Defendant was located), who he was staying with, and the fact that he was in possession of a firearm from a police informant who previously had provided police with information leading to arrests and contraband and who was actively assisting police in other investigations at the time he or she provided the information about Defendant.

■ 2. The factual mistake that 5515 Hunter Street is a three-unit apartment house and not a single-family residence did not retroactively invalidate the otherwise valid search warrant because the warrant—as issued—"described the structure [of the place to be searched] as it was

known ... to the officers after reasonable inquiry under the circumstances." [6]

3. The team members' failure to realize the overbreadth of the warrant was objectively understandable and reasonable because (1) the public records search of 5515 Hunter Street did not reveal that the residence was sub-divided into three units; (2) the confidential informant did not indicate to Det. Marano that the building was comprised of three apartments; (3) Det. Marano's sixteen years of law enforcement experience in West Philadelphia did not reveal to him that the residential buildings on Hunter Street are multi-unit dwellings; and (4) Det. Marano's external observations of the premises understandably did not reveal that the property contained three separate apartments. Concerning Det. Marano's first-hand observations of the premises, it is objectively understandable that he failed to discern the internal composition of the property when quickly driving by the building in an unmarked police vehicle with his confidential informant ducking down in the backseat. Additionally, it is objectively understandable that team members, when on the porch of the residence prepared to execute a search warrant for a fugitive of justice believed to be in possession of a firearm, failed to realize in the relative darkness of a predawn autumn morning that the building contained three apartments—notwithstanding the fact that several team members had flashlights and there is an intercom box on the front porch with three "buzzers."

■ 4. VCIT members "mere entry into the building's common areas was reasonable and lawful because the officers

---

**6.** See *United States v. Ritter,* 416 F.3d 256, 266 (3d Cir.2005) (holding that a validly issued search warrant is not retroactively invalidated where law enforcement officers become aware subsequent to the warrant's issuance that the place to be searched is "broader than appropriate because it was based on the mistaken belief that there was only one dwelling" at a specific address.).

carried a valid warrant authorizing entry upon the premises." [7]

5. Once team members "knew ... of the error in what they encountered versus what was authorized by the warrant, they were obligated to either limit their search to those areas clearly covered by the warrant or to discontinue entirely their search." [8]

■ 6. Here, VCIT members did not limit their search or discontinue the search entirely. However, team members' failure to limit or discontinue their search "does not necessarily ... result in suppression" of the firearm eventually seized in Apartment C.[9]

7. Rather, the legality of the team members' conduct when acting on authority of the search warrant for 5515 Hunter Street "must be judged 'in light of the information available to them at the time they acted'" [10] and the permissible limits of their search must be judged on the basis of "the information available as the search proceed[ed]." [11]

8. Based on the foregoing, team members' conduct in the apartment house on the authority of the search warrant for 5515 Hunter Street and the arrest warrant for Defendant was legal. First, judging the constitutionality of the team members' conduct in the execution of the search warrant in light of their knowledge that (1) Defendant was a fugitive from justice wanted for a violent crime; (2) Defendant likely was in possession of a firearm; and (3) team members possessed a valid warrant for Defendant's arrest, it is unreasonable to require law enforcement officers to discontinue their search of the premises under these circumstances. Second, the permissible scope of the team members' search extended to Apartment C because the likelihood that Defendant could be found at 5515 Hunter Street did not decrease one scintilla upon team members' realization that the building was a three-unit apartment house and not a single-family home. Rather, the likelihood that Defendant could be located in a specific residence within the building decreased from one-in-one to one-in-three.

9. Team members' search of Apartment A has no legal significance to the determination of the legality of the eventual search of Apartment C,[12] however, the search of Apartment A carries the logical significance of informing team members that Defendant was not in Apartment A. Thus, it was reasonable for team members to surmise after searching Apartment A that Defendant was in either Apartment B or Apartment C. Likewise, knocking and announcing the presence of law enforcement at the door to Apartment B has no

---

7. *Id.*

8. *Id.*

9. *See id.* (noting that the "ultimate directive" in *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), controls the legality of a search of a premises subsequently discovered to be sub-divided into separate units after a search warrant issues permitting the search of the general address).

10. *Ritter*, 416 F.3d at 266 (quoting *Garrison*, 480 U.S. at 85, 107 S.Ct. 1013.).

11. *Id.* at 87, 107 S.Ct. 1013.

12. Whether the constitutional rights of the inhabitants of Apartment A were violated when team members searched that apartment looking for Defendant is an open question. Yet, the Court need not reach that question when deciding Defendant's motion to suppress because Defendant, as an overnight guest in Apartment C, only has a privacy interest in that apartment and, thus, lacks standing to challenge the search of other people's apartments. *See Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (holding that the Fourth Amendment protects from unreasonable searches only those places where persons have a legitimate expectation of privacy).

bearing on the issue of the legality of the search conducted in Apartment C.[13] But, the fact that team members knocked and announced their presence and intention to execute a search warrant at Apartment B also has logical import: team members reasonably could conclude after knocking and announcing their presence that since no one responded from within Apartment B that no one was inside at that time.

10. Team members possessed legal authority to knock on the door to Apartment C and announce their presence and intention to execute the search warrant.

11. Once team members observed Apartment C's female occupant gesture to the back of the apartment indicating that Defendant was inside, they had reason to believe that Defendant was inside Apartment C at that time.

12. Team members then legally entered Apartment C to arrest Defendant because they possessed a valid arrest warrant and had probable cause to believe

that Defendant was in the dwelling at the time they entered.[14]

13. Team members legally arrested Defendant in the bedroom on the authority of the arrest warrant.

■ 14. Team members legally searched the bedroom of Apartment C on the authority of the validly issued search warrant, and legally seized the firearm from the bedroom closet.[15]

### III. Conclusion

Based on the totality of the circumstances, the search warrant issued for 5515 Hunter Street was supported by probable cause. Team members' search of 5515 Hunter Street, Apartment C was reasonable under the circumstances, and team members' seizure of the firearm from the bedroom closet of the apartment did not violate Defendant's Fourth Amendment rights. Therefore, the fruits of the legal arrest and search of the premises, including Defendant's statement given while in custody and the firearm seized in Apart-

**13.** The Court notes that team members legally were permitted to traverse the stairwell and hallways of the apartment house because the residents (including Defendant) had no reasonable expectation of privacy in the building's common areas. *See United States v. Acosta,* 965 F.2d 1248, 1252 (3d Cir.1992) (noting that one's privacy interest extends only so far as the limits of the area over which one has a way to exclude others and exercise exclusive control, i.e., one's own apartment).

**14.** See *United States v. Agnew,* 407 F.3d 193, 197 (3d Cir.2005) (holding that law enforcement officers armed with an arrest warrant and probable cause to believe that the subject of the arrest warrant is located within a specific location may enter that location to arrest a suspect). In *Steagald v. United States,* 451 U.S. 204, 211–14, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court held that the Fourth Amendment does not permit law enforcement officers to enter the residence of a third-party to execute an arrest warrant for a

suspect. However, *Steagald* protects only the interests of the third-party homeowner, not the suspect. *See id.* at 212, 101 S.Ct. 1642. Thus, even though Defendant possessed a privacy interest in Apartment C as an overnight guest, the Fourth Amendment does not protect him from arrest by team members armed with an arrest warrant. *Agnew,* 407 F.3d at 197.

**15.** In addition to the search warrant, team members could legally search the closet in the bedroom of Apartment C as part of the protective sweep of the premises to protect the safety of the police officers and others. See *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (holding that Fourth Amendment permits a cursory search of places where an individual may be found incident to an in-home arrest where police have reasonable belief based on articulable facts that the area to be searched harbors someone posing a danger to police officers).

ment C, are hereby admissible at trial on the charge in the indictment against Defendant.

An appropriate Order follows.

## ORDER

**AND NOW**, this 13th day of July 2006, upon consideration of Defendant's Motion to Suppress Physical Evidence and Statement,[1] the Government's response thereto,[2] and an evidentiary hearing, it is hereby Ordered that the Motion is Denied.

It is so ORDERED.