UNITED STATES OF AMERICA

v.

**Garry R. BENISH, Appellant.**

No. 92–3311.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1 Sept. 13, 1993.

Decided Sept. 16, 1993.

---

Peter Goldberger, Pamela A. Wilk, and James H. Feldman, Jr., Law Office of Peter Goldberger, Philadelphia, PA, for appellant.

Thomas W. Corbett, Jr., U.S. Atty. and Paul J. Brysh, Asst. U.S. Atty., Pittsburgh, PA, for appellee.

Before: SLOVITER, Chief Judge, MANSMANN and GREENBERG, Circuit Judges.

**OPINION OF THE COURT**

SLOVITER, Chief Judge.

This appeal arises out of a judgment of conviction and sentence in a criminal case against Garry R. Benish for possession with intent to distribute in excess of 100 marijuana plants in violation of 21 U.S.C. § 841 (1988). Defendant Benish appeals the denial of his motion to suppress the evidence of the marijuana plants seized from his farm and the district court's refusal to grant a downward departure in sentencing. We have jurisdiction under 28 U.S.C. § 1291 (1988).

**I.**

*FACTS AND PROCEDURAL HISTORY*

On June 21, 1991, an employee of Central Electric Cooperative, Inc., an electric utility company, informed the Pennsylvania State Police that there had been an abnormal consumption of electricity at a farm in Sugarcreek Township and that the electricity had been turned off due to nonpayment. The employee also informed the police that the doors and windows of the residence were covered with dark plastic.

Based on this information, Trooper Jeffrey Rood, an employee of the Pennsylvania State Police, suspected the operation of a methamphetamine laboratory. Rood visited the property with a utility company employee (who intended to turn the electricity back on because the bill had been paid). Rood intended to disguise himself as another utility company employee, if necessary. While at the farm, Rood knocked on the door of the residence (a trailer that had been turned into a permanent structure) but no one answered. Rood walked around the trailer structure and observed the dark plastic covering the windows.

As a result of his visit, Rood believed that marijuana was being grown inside the house.

He then began and coordinated an investigation, using the Pennsylvania Army National Guard.

On June 27, 1991, a squad of guardsmen, under the command of Lieutenant Ross Gammon, took up positions in the woods near the farm to conduct surveillance.[1] Gammon set up a command post in a nearby church. The next day, Joshua Porter, one of the guardsmen, was ordered to take a position on the other side of the Benish residence. In crossing the Benish property, Porter observed what he suspected to be a marijuana plant. After reporting back to Lieutenant Gammon and receiving instructions, Porter returned to the plant and took a sample, which a field test confirmed was marijuana.

On the same day, the State Police arranged an overflight of the farm by helicopter. Agent Fred Neal of the Pennsylvania Office of Attorney General, Bureau of Narcotics Investigation and Drug Control, Gammon and Trooper Leonard Lapato were on the flight. From an altitude of 2000 feet, Lapato observed marijuana growing on the farm. Gammon testified that he did not observe any marijuana but that he was "no expert." App. at 193. The overflight was ordered before the seizure of the marijuana plant by Porter, but it actually took place after the field test was completed.

After the seizure and the overflight, Neal and Rood prepared an affidavit in support of probable cause for a search warrant. The warrant was signed by a state court judge on June 30, 1991. In a search of the farm and the residence pursuant to the warrant on July 1, 1991, over 900 marijuana plants were discovered. Some plants were seized for samples and evidentiary purposes and the remaining plants were destroyed.

Also on July 1, 1991, Benish was arrested pursuant to an arrest warrant. He was initially charged with state offenses, but on October 2, 1991, he was indicted by a federal grand jury for the same conduct, and the state information was *nolle prossed.*

---

1. The district court found that the record was unclear as to exactly on whose property the guardsmen were located, but clear that no property owner gave the Guard permission to "bivo-

On October 25, 1991, Benish filed both a motion to suppress the evidence seized from his property and a motion to dismiss the indictment. After a hearing, the district court denied both motions. *See United States v. Benish*, 782 F.Supp. 35 (W.D.Pa. 1992).

On January 21, 1992, Benish entered a conditional plea of guilty to possession with intent to distribute in excess of 100 marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A)(vii) (1988), expressly reserving his right to challenge on appeal the district court's denial of his motion to suppress evidence and his motion to dismiss the indictment.

On February 21, 1992, Benish filed a motion challenging the applicable portion of section 2D1.1 of the United States Sentencing Guidelines as unconstitutional. On February 28, 1992, Benish filed his objections to the presentence investigation report, contesting several of its factual findings, including the application of section 2D1.1. After a hearing, the district court denied Benish's motion challenging the constitutionality of section 2D1.1, a ruling Benish has not appealed.

At the sentencing hearing, the district court adopted the presentence report's count of 940 plants which resulted in a base offense level of 30. The district court reduced the base offense level by 2 for acceptance of responsibility, resulting in a total offense level of 28. The guideline range (based on a Criminal History Category of I) was 78–97 months imprisonment. The district court sentenced Benish to the minimum 78 months, noting on the sentencing form that the sentence was *"solely* due to the guidelines." App. at 487. At the sentencing hearing the district judge commented that he believed the sentence "was harsh and perhaps unreasonable," but concluded that Benish's argument that "the guidelines fail to address the sex and age of the marijuana plants" did not provide a basis for a downward departure. App. at 476–77. Benish filed a timely appeal.

## II.

### *DISCUSSION*

On appeal, Benish argues (1) that the warrantless seizure of the first marijuana leaf by Porter as he crossed the Benish property and the subsequent seizures of the marijuana plants pursuant to warrant violated the Fourth Amendment; (2) that the use of the Pennsylvania National Guard violated federal law; and (3) that the district court's refusal to grant a downward departure was based on an erroneous view of its own discretion.

### A.

### *Legality of Seizure*

Benish argues that the sample leaf was illegally seized because the plant from which it was taken was located within the curtilage of Benish's residence and not in an "open field" where a warrantless seizure is constitutional. Benish asserts that the scope of the "curtilage" of a particular residence is a mixed question of law and fact, and therefore that our review is plenary. The question whether the extent of curtilage is a question of fact or law is unresolved by this court. In a recent case, we assumed without deciding that the extent of curtilage was a question of fact subject to clearly erroneous review. *See United States v. Acosta*, 965 F.2d 1248, 1255, 1257 (3d Cir.1992).[2] We have not considered this question in any decision since *Acosta*, but other courts of appeals have concluded that the district court's determination of curtilage is a factual determination subject to review only for clear error. *See, e.g., United States v. Traynor*, 990 F.2d 1153, 1156–57 (9th Cir.1993); *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir. 1993); *United States v. Hatch*, 931 F.2d 1478, 1480 (11th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 235, 116 L.Ed.2d 191 (1991); *United States ex rel. Saiken v. Bensinger*, 546 F.2d 1292, 1297 (7th Cir.1976), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2633, 53 L.Ed.2d 245 (1977). We agree with these

---

uac on their land." *United States v. Benish*, 782 F.Supp. 35, 36 (W.D.Pa.1992).

**2.** Because the court in *Acosta* applied the clear error standard when it reversed the district

court's conclusion that the backyard of the defendant's apartment building was part of the curtilage of his apartment, it did not reach the issue whether a less deferential standard of review might apply. *Acosta*, 965 F.2d at 1257 n. 12.

courts that the question of the extent of curtilage is "essentially factual," *Traynor*, 990 F.2d at 1156, and therefore we review only for clear error.

In *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987), the Supreme Court held that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." It listed four factors as relevant to this inquiry: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301, 107 S.Ct. at 1139.

The Court explained that the four factors did not, when combined,

> produce[] a finely tuned formula that, when mechanically applied, yields a correct answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

*Id.* Thus, for example, in *Acosta* we decided that certain of the *Dunn* factors, which were derived in a case concerning the location of a barn on farm land, "may be less determinative in a city setting" and as applied to apartment dwellings.. 965 F.2d at 1256.

The district court considered the four *Dunn* factors and concluded that the marijuana plant was not located within the curtilage of Benish's residence, and hence the seizure of the leaf did not violate the Fourth Amendment. Benish has not persuaded us that the court erred. We see no reason why the fact that the Benish farm is only 10–acres, as compared to the 198–acre farm in

*Dunn*, is enough to render the *Dunn* factors of "insignificant value," as Benish argues. The significant, and undisputed, facts are that the marijuana plant was growing on the other side of the barn, at least 100 meters, maybe more,[3] from the Benish residence which, as the district court noted was a greater distance from the residence than the barn was located in *Dunn*; that the plant was not within any fenced off or enclosed area surrounding the residence or within the 50 meters of cut grass; that the area was not protected from observation other than possibly from the air; and that the area was not used for intimate activities. As the district court stated, "the area in which the plant was discovered did not harbor the 'intimate activity associated with the sanctity of a man's home and the privacies of life.' " *Benish*, 782 F.Supp. at 37 (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quotation omitted)). We therefore conclude that the district court's conclusion that the plant was not within the curtilage is not clearly erroneous.

■ Benish further argues that even if the plant from which the leaf was taken was located outside of the curtilage, the seizure was not a valid "plain view" seizure, either because Porter was standing within the curtilage when he saw the plant or because it was not immediately apparent to Porter that the plant was marijuana. A plain view seizure is legal only if the officer is legally located at the time the seized item is seen. *See Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990).

■ Porter testified that:

> the lieutenant asked me to go around the back of the property, the other side of the house, whatever, see if we could find a better spot to watch from over there. So, when I was going around behind the house to find a better spot to watch him, that is when I discovered the plot....

App. at 78–79. Benish's counsel asked Porter whether he was

---

3. Although the district court stated that the plant was growing 200 meters from the *barn* when, in fact, there was no testimony regarding the distance from the barn to the plant, this does not

undermine the court's conclusion because the evidence shows that the marijuana plant was found at a greater distance from the residence than was the incriminating evidence in *Dunn*.

conducting a covert surveillance on behalf of the Pennsylvania State Police in an attempt to get *as close to [Benish's] residence* to see what was taking place in that house at the time you discovered that marijuana plant?

App. at 81 (emphasis added), and Porter responded "Yes."

This answer does not establish that Porter was illegally located. Porter's testimony could mean that he was trying to get "as close" as legally possible. The question was ambiguous. There is simply no evidence that Porter was illegally located when he spotted the marijuana plant. Thus, although the record is not clear about exactly where on the property Porter was standing,[4] we see nothing in the record that undermines the district court's conclusion that the seizure of the first marijuana leaf was a legal plain view seizure.

■ Benish also argues that it was not "immediately apparent" to Porter that the plant was marijuana. Under *Texas v. Brown*, 460 U.S. 730, 741, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983), a plain view seizure is justified only if the "incriminatory character" of the item sought to be seized is "immediately apparent" at the moment preceding the seizure.

In response to the question "How did you know that it was a marijuana plant?", Porter testified, "We have free time we have classes and things on marijuana, paraphernalia recognitions. Just from school and criminology classes." App. at 79. That answer provides sufficient evidence that Porter had probable cause to believe the plant was marijuana at the time the seizure occurred. Benish had the opportunity to inquire further about the classes Porter took or to probe Porter's lack of qualification, but he failed to do so. In light of the evidence, we cannot conclude that the district court erred in finding that the seizure of marijuana was legal.

Benish's argument that the seizures of the marijuana plants pursuant to the warrant

also violated the Fourth Amendment is predicated on his argument that the initial warrantless seizure of the marijuana leaf was illegal. Because we have concluded that the initial seizure was legal, we also conclude that the seizure of the marijuana plants pursuant to warrant was legal.

B.

*Military Operations on Benish's Property*

■ Benish argues that the use of the Pennsylvania National Guard by the state police to bivouac on his property, conduct surveillance, and seize contraband violated federal laws pertaining to the use of military operations for civilian law enforcement and require the suppression of the seized evidence. The propriety of using the National Guard for civilian law enforcement raises legal issues subject to plenary review.

Benish concedes, albeit indirectly, that this argument was not raised in his motion to suppress. Apparently in order to avoid waiver, Benish addresses the argument via a claim that his counsel was ineffective in failing to raise this argument before the district court. As a general rule ineffectiveness claims are not entertained on direct appeal. *See United States v. Touby*, 909 F.2d 759, 773 n. 8 (3d Cir.1990), *aff'd*, — U.S. —, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). However, in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that a defendant must show both inadequate representation and prejudice to succeed on a Sixth Amendment ineffective assistance of counsel claim. If the record establishes that the claim lacks merit, the ineffectiveness claim clearly fails and it can be resolved on direct appeal.

■ We conclude that the use of the Pennsylvania National Guard did not violate any federal law. Although Benish refers to the Posse Comitatus Act, 18 U.S.C. § 1385,[5] that

---

4. In reaching its conclusion that the seizure was legal, the district court did not make an explicit finding about where Porter was standing when he saw the marijuana plant, but such a finding is necessarily subsumed in its ultimate conclusion that the seizure was legal.

5. The Posse Comitatus Act provides that:
   Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, wilfully uses any part of the Army or Air Force as a posse comitatus or otherwise to execute the laws shall be fined

Act precludes use of "the Army or Air Force" and Benish concedes that the Pennsylvania National Guard unit was not in federal service at the time of its operation. Thus, the Posse Comitatus Act is inapplicable.

Benish notes that 32 U.S.C. § 112 (1988) authorizes the federal government to provide funding to states for the use of the National Guard in "drug interdiction and counter-drug activities" if those "counter-drug activities" are "authorized by State and local law and requested by the Governor." Benish argues that Pennsylvania state law does not authorize the National Guard to engage in this type of operation and therefore that the evidence obtained of marijuana cultivation must be suppressed.

We reject that argument for several reasons. First, 32 U.S.C. § 112 addresses only the requirements for federal funding and by its plain language does not govern the legality of the actions of the National Guard. Indeed, the statute specifically provides that:

> Nothing in this section shall be construed as a limitation on the authority of any unit of the National Guard of a State, when such unit is not in Federal service, to perform law enforcement functions authorized to be performed by the National Guard by the laws of the State concerned.

32 U.S.C. § 112(d).

Second, even assuming *arguendo* that this statutory provision incorporates state law governing the actions of the Pennsylvania National Guard, *see* Pa.Cons.Stat. § 391e(a), the actions in this case have not violated this state law. Under Pennsylvania law, the Governor is authorized to place members of the National Guard on special state duty to "support Federal, State and local drug eradication and interdiction operations." *Id.* Benish argues that "support" is distinguishable from "direct involvement in civilian criminal law enforcement, such as in searches or seizures." Appellant's Brief at 43. However, Benish provides no legal support for his argument or any persuasive reason for us to try to draw a line between "support" and

"direct involvement" when there is no indication in the statute itself or anywhere else that such a line was intended. We therefore reject Benish's contention that the activities of the National Guard in this case requires suppression of the evidence. It follows that Benish's ineffective assistance of counsel claim fails.

## C.

### *Sentencing*

We turn finally to Benish's challenge to the sentence. The district court found that Benish possessed 940 marijuana plants. Under section 2D1.1 of the Sentencing Guidelines, one marijuana plant is treated as the equivalent of 1 kilogram of marijuana if the offense involves 50 or more marijuana plants. U.S.S.G. § 2D1.1. Thus, under the Guidelines, Benish was sentenced as if he possessed 940 kilograms of marijuana.

Although the district court granted a downward departure for acceptance of responsibility, it declined Benish's request for a downward departure on the ground that "the guidelines fail to address the sex and age of the marijuana plants." The court stated: *"In our judgment, none of those are a basis for a downward departure.* We've made factual findings, we've reviewed the guidelines in this case in great detail, and although we believe the sentence is harsh and perhaps unreasonable, we are bound to apply the precedent." App. at 476–77 (emphasis added).

Benish argues that the district court concluded that it lacked discretion to grant a downward departure in this case, and that this conclusion was error. There is some ambiguity whether the court believed it could depart from the minimum 78–month sentence fixed by the Sentencing Guidelines downward to the five year mandatory minimum sentence imposed by statute. 21 U.S.C. § 841(b)(1)(B) (1988). The statement of the district court emphasized above and its notation on the sentencing form that the sentence is imposed *"solely* due to the guidelines," with a double underlining of the word "sole-

---

not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385 (1988).

ly," App. at 487, provides some basis for Benish's argument that the court believed it lacked discretion. Therefore, we will assume *arguendo* that the district court concluded it could not depart downward because of the age and sex of the marijuana plants, and we consider whether that conclusion was erroneous. This presents a legal issue subject to our plenary review. *See United States v. Higgins,* 967 F.2d 841, 844 (3d Cir.1992).

■ As is by now well recognized, under the Sentencing Reform Act the sentencing court may impose a sentence outside the range established by the applicable guideline only if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, *not adequately taken into consideration by the Sentencing Commission* in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988). (emphasis added)

The introduction to the Guidelines explains that "[t]he Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. Ch. 1, Pt. A, 4(b).

In *United States v. Ryan,* 866 F.2d 604 (3d Cir.1989), we held that the district court sentencing a defendant convicted of possession of "crack" cocaine (who had been acquitted of possession with intent to distribute) could apply an upward departure because of the amount of drugs possessed, the purity of the drugs, and the packaging of the drugs. We rejected the defendant's argument that because the relevant guideline for simple possession, U.S.S.G. § 2D2.1, did not take into account the quality, quantity and/or purity of the drug, the Sentencing Commission presumably considered and rejected those factors as a permissible basis for departure. We held, instead, that unless the applicable

guideline expressly precludes the sentencing court from considering a particular factor, departures based on any factor that the district court believes is inadequately taken into consideration by the applicable guidelines are potentially within the discretion of the district court. In essence, departure is appropriate for an atypical case. *See United States v. Bierley,* 922 F.2d 1061, 1067–68 (3d Cir.1990). Indeed, in *Ryan* we noted that the case was unusual in light of the acquittal of trafficking notwithstanding the quantity, purity, and packaging of the drug at issue. 866 F.2d at 609. We see nothing atypical or unusual in the fact that the particular plants here were male, old, and possibly weak.

■ Moreover, in this case, it is a different guideline, section 2D1.1, that is at issue. Although the guideline is primarily devoted to processed controlled substances, it is apparent that the Commission gave serious consideration to how to assign the equivalency figures to marijuana plants. In the Commentary, the Commission explained its decision by reference to the statutory penalties in 21 U.S.C. § 841(b)(1)(A), (B) & (D), which link the severity of punishment to the number of marijuana plants "regardless of [their] weight."

The exclusive focus on the number of marijuana plants leads us to conclude that the Commission considered and rejected any other factors. Thus, we see no basis on which a district court could conclude that the age or sex of particular marijuana plants are factors that have not "adequately" been considered by the Commission.[6] Our decision is consistent with that of the Seventh Circuit in *United States v. Upthegrove,* 974 F.2d 55, 56 (7th Cir.1992), where the court held that a downward departure under section 2D1.1 based on the quality of marijuana was improper because "[i]t is clear from the text of the guidelines that the Sentencing Commission adequately took into consideration the quality of the drugs. The Sentencing Commission made an explicit decision to focus on the

---

**6.** We need not consider the extent to which this analysis applies to processed marijuana or other

controlled substances.

weight and not the purity of the drugs in determining the offense level."

We conclude that the district court did not have discretion to depart downward for the age and sex of the plants and that it did not err in holding that the sentence imposed on Benish was compelled by the Guidelines.

## III.

### *CONCLUSION*

For the reasons set forth in the foregoing opinion, we will affirm the judgment of conviction and sentence.