**UNITED STATES of America,**

v.

**Antonio SCULCO and Jason Frank Borelli.**

**Nos. 99–00381–01, 99–00381–02.**

United States District Court, E.D. Pennsylvania.

Feb. 3, 2000.

---

David E. Troyer, Asst. U.S. Atty., Philadelphia, PA, for U.S.

Joseph N. Bongiovanni, Philadelphia, PA, for Antonio Sculco.

Michael E. Wallace, Philadelphia, PA, for Jason Frank Borelli.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

This case began with an indictment filed on July 7, 1999, naming only defendant Antonio Sculco in three separate counts. This was followed with a superseding indictment (the "Superseding Indictment") naming both defendant Antonio Sculco and defendant Jason Frank Borelli. Borelli was only charged in count 2, while Sculco continued to be named in all three counts. Sculco was initially before this court on for a bail hearing and the court ordered him detained.

On Friday, January 21, 2000, Sculco pled guilty to counts 1, 2 and 3 of the Superseding Indictment charging him with: Possession with Intent to Distribute more than 5 grams of cocaine base, that is, "crack", in violation of Title 21, United States Code, Section 841(a)(1); Possession with Intent to Distribute heroin, in violation of Title 21, United States Code, Section 841(a)(1); and Possession of a Firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1), all arising from Sculco's possession of approximately 17.43 grams of crack cocaine, approximately 74.8 grams of heroin, and a Keltec P11 9–millimeter handgun, in Reading, Pennsylvania, on May 13, 1999.

The same day, Borelli pled guilty to count 2 of the Superseding Indictment charging him with Possession with Intent to Distribute heroin, in violation of Title 21, United States Code, Section 841(a)(1), all arising from Borelli's possession of approximately 74.8 grams of heroin, in Reading, Pennsylvania, on May 13, 1999.

The pleas were conditional under Fed. R.Crim.P. 11(a)(2) [1], allowing each defendant to appeal this court's ruling with regard to suppression motions filed by the defense. Each defendant indicated satisfaction with the Government's response to all other pretrial motions and these will not be appealed. We issued an order on January 21, 2000, denying these other motions as moot. We conducted a hearing on each defendant's suppression motion that same day and at the end of the hearing, ruled from the bench that the motions were denied. We reserved the right to file a detailed memorandum setting forth its findings of fact and conclusions of law with regard to suppression issues. This memo-

---

1. In this district, it is also known as a Zudick plea. *See United States v. Zudick,* 523 F.2d 848 (3d Cir.1975).

randum presents those findings and conclusions.

## II. FINDINGS OF FACT

The suppression hearing held on Friday, January 21, 2000, dealt primarily with the entry by Reading Police into a row house at 214 South Fourth Street in Reading, Pennsylvania. The court makes the following findings of fact with regard to the suppression hearing.

(1) On May 13, 1999, two Reading, Pennsylvania police officers Olivieri and Gooch were on routine bicycle patrol. Although their uniforms were somewhat modified to better accommodate the physical demands of riding a bicycle, the officers were nevertheless clearly identifiable as police officers. Their uniforms displayed a badge and had large letters that spelled "police" on them. The officers had weapons and two-way radios. Officer Olivieri had ten years of police experience. Hearing Tr., at 30–31.

(2) When the officers were in the area of South Fourth Street in Reading, which is not their usual area of patrol, at approximately 6:30 p.m., at a distance of approximately 4 or 5 car lengths away, the officers saw an adult male in blue clothing standing on a street corner. Hearing Tr., at 31–33, 67. The officers did not recognize who this male was at that time. Hearing Tr., at 68.

(3) The male looked in the direction of the two police officers and although nothing was said by the officers or the male, the male immediately lowered his head and ran at high speed across the street and through the front door of a row house at 214 South Fourth Street. Hearing Tr., at 32–33, 74. He was running so fast that he did not look for traffic as he crossed the street. Hearing Tr., at 70. His actions attracted the attention [2] of the police officers. Hearing Tr., at 34.

(4) The officers followed the male to 214 South Fourth Street. The officers were not familiar with this house and thought that the row house at 214 South Fourth Street was abandoned because a large front window was boarded up and one of the windows in the door was also boarded up. Hearing Tr., at 34, 36, 72. The court viewed photographs of the house at the suppression hearing and we find that the belief of the officers that the property was abandoned was a reasonable one.

(5) The front door opened directly onto the public sidewalk. One of the officers went to the front door and knocked on the door for a long period of time. Hearing Tr., at 36–37. He also yelled "Reading Police" loudly several times. When no one answered, he looked in the mail slot, but being blocked off so that it was not possible to see inside the home, he tried the door to see if it was locked and found that it was locked. His intention had been to open the door and yell "police" inside the house. No entry was made by the police into the house at 214 South Fourth Street at this time. Hearing Tr., at 74–76.

(6) The officers then talked to a next-door neighbor who told them that a man named Tony lived in the house at 214 South Fourth Street. The officers concluded that the home was not abandoned but felt that under the circumstances there was nothing further that they could do. At that point, as they prepared to leave the area on their bicycles, they heard a dog barking in the backyard of the other house adjoining the house at 214 South Fourth Street. Separating these houses was an enclosed alley way commonly called a breeze way. The breeze way had a locked gate with metal bars which adjoined the sidewalk. Hearing Tr., at 37–40, 75–77.

(7) The dog's barking attracted the attention of the officers because of its inten-

---

**2.** Obviously, the court did not witness the male running on the evening in question. Words often cannot adequately describe all the unusual or furtive actions that can give rise to a reasonable suspicion in a trained police officer. We are satisfied that the overall effect of the actions of the adult male on the evening in question were sufficient to raise a reasonable suspicion in the two Reading police officers.

sity. Although their view was limited[3], the officers could see the dog through the breeze way. The dog was looking up at the house at 214 South Fourth Street. One of the officers saw an individual dressed in blue climbing down from the roof of 214 South Fourth Street. Hearing Tr., at 40–41.

(8) The officers returned to the neighbor and asked if they could have access to the neighbor's rear yard which adjoined the back yard of 214 South Fourth Street. The neighbor complied. The officers went through the neighbor's house and as they emerged in the rear yard they could see four adult males. Three of the four males were in the neighbor's yard in the process of climbing a fence which gave access to an adjoining street named Carpenter Street. A fourth male, in blue clothing, had just climbed over another fence between the neighbor's yard and 214 South Fourth Street. The fence had been trampled down and bent. The officer could also see an second-story window at 214 South Fourth Street, which had been pushed as far open as it would go. It was obvious from the open window, the way in which the wire fence had been trampled down, and the direction of travel of the males, that they had just emerged from 214 South Fourth Street. Hearing Tr., at 41–43.

(9) The officers believed that a burglary was in progress at 214 South Fourth Street. Hearing Tr., at 46. One officer pursued the adult males who had just climbed the fence while the other officer immediately radioed in a call for additional police assistance. One officer was successful in catching two of the individuals on Carpenter Street. Both of these individuals were out of breath, sweating profusely and panting heavily. The individuals who were apprehended were Jason Borelli, a defendant in this case, and his brother, Frank Borelli. Hearing Tr., at 44–46, 87–89.

(10) The officer asked the two brothers why they had jumped out of the window and ran. They said they ran because they were scared when they saw the police. They also stated that the person at 214 South Fourth Street let them use the house. The officer asked who that person was and they said they did not know his full name, identifying him only as "Fat Tony." Hearing Tr., at 45–47.

(11) The officers did not believe the story given by the two Borelli brothers. Hearing Tr., at 111–113. They believed that a burglary had been carried out and that it might still be in progress. Hearing Tr., at 45. They again knocked on the front door of 214 South Fourth Street and, getting no answer, got permission from the neighbor to climb the neighbor's fire escape. Hearing Tr., at 47.

(12) Officer Olivieri then crossed onto the roof of 214 South Fourth Street and looked in the open window from the outside. By this point, other officers had arrived and secured the house front and back. Officer Olivieri noted that the room was in disarray, clothing was strewn about, and the knob of the inside door leading to the room from an interior hallway had been broken off. He again yelled "Reading Police" loudly several times, but received no response. Hearing Tr., at 47–49.

(13) Officer Olivieri concluded that a burglary had been or was still in progress and that inside he might find more burglars or a victim who was in need of immediate police assistance.[4] He entered

---

3. We have viewed photographs of the breeze way and find that it was possible to see down it. We do not credit the testimony at the hearing of Sculco's father that it is not possible to see down the breeze way. Furthermore, on cross examination this witness admitted that it was possible to see down the breeze way to some extent.

4. The common-sense concerns abound. There might have been burglars inside who were still carrying out the crime, destroying evidence, escaping or hiding from the police. There might have been victims inside, in need of immediate police assistance because they were injured, physically restrained, or being held at gunpoint. We find that these concerns were real, urgent and deserving of an immediate response.

through the wide-open window and two other officers followed him into the premises at 214 South Fourth Street. They conducted an initial sweep looking only for individuals who were either criminals or in need of assistance. Hearing Tr., at 48–53.

(14) The officers went down a hallway and found a door to another bedroom. They banged on this door and yelled "Reading Police", but there was no response. They then forced open the door and found the defendant, Antonio Sculco, lying on a mattress on the floor asleep. Immediately next to the mattress in plain view was a 9mm handgun and a plastic bag with a white substance in it. There were other empty packets strewn around the bed. Hearing Tr., at 51–55.

(15) When Antonio Sculco woke up, he immediately put his hand on the gun. One of the officers seized the gun and took it away. Officer Olivieri recognized Sculco as a person who had been his jeweler. From his years of experience, he also recognized that the substance in the bag appeared to be a controlled substance. Sculco looked at the officer and said, "Sal?" The officer said, "Tony, what are you doing here? Are you into this shit?" Sculco answered, "You know, Sal." Hearing Tr., at 54–56.

(16) The officers asked Sculco for identification, which he produced, and they determined that he was lawfully on the premises and was not a burglar. Hearing Tr., at 114–118. Sculco also stated that no one else was supposed to be in the house although he allowed the Borellis to use the house from time to time.[5] One of the officers went downstairs and saw two-way radios and drug paraphernalia, including packaging material, on a dining room table in plain view. He heard another officer ask Sculco, "Is that all you have?" Sculco said, "Yes, that's all I have, you can search if you want." Hearing Tr., at 56–57.

(17) The police continued to look around and found heroin in a refrigerator. At this point in time, they determined that they should obtain a formal search warrant. The officers "froze" the house at 214 South Fourth Street and restricted access until the warrant was obtained. Hearing Tr., at 57–58. The validity of this warrant is not questioned by the defense except to the extent that it relied upon information obtained in the initial warrantless entry into the house.

## III. DISCUSSION

### A. Standing

The suppression hearing began with testimony from two defense witnesses for the purpose of establishing the standing of each defendant to seek suppression of evidence. On this issue, we find the testimony of Teresa Sculco to be credible. She testified that her father owned the property at 214 South Fourth Street and that to her knowledge, although Borelli was permitted to enter the house when he wanted, he was not there very much and did not sleep over. We do not credit the testimony of Sculco that Borelli stayed over five or six times. We decline to do so because of the manner in which Sculco testified, the interest of Sculco and his fellow defendant in the outcome of this case, and the conflict of his testimony with that of Teresa Sculco. We find that Borelli did not stay overnight in the home and that he lacked sufficient standing to seek suppression of evidence seized from the house.

■ We find that Sculco does have standing to seek suppression of evidence based upon the testimony that he was regularly staying in the home so that he could repair it. This is consistent with Sculco's statement to the police on May 13, 1999 that only he was permitted in the premises, although he sometimes gave permission to others to use the premises. It

**5.** As noted, the police had also been told by a neighbor that a man named "Tony" lived in the house and the Borelli brothers had said the person who had let them use the house was "Fat Tony". We find that the belief of the officers that Sculco was in charge of the house was reasonable under all the circumstances.

is also consistent with the statement by the neighbor that a man by the name of Tony lived in the house and the statement by the Borelli brothers that the person who let them use the house was Fat Tony. During the hearing, the defense made an anatomical profference of the size of Sculco, and we noted that he was of ample girth.

The evidence concerning the actual entry into the home consisted almost entirely of the testimony of Officer Olivieri. The defense presented only the testimony of Sculco's father, Domenico Sculco, who first stated that it was impossible to see down the breeze way and then contradicted himself on cross-examination. As noted, we have found that it was possible to see down the breeze way. We found the testimony of Officer Olivieri to be fully credible. He had a good memory and his answers were direct, consistent and truthful, whether they worked to his benefit or not. His testimony did not vary in any significant way from the limited findings of fact we made with regard to the bail hearing on August 25, 1999. His testimony remained basically unchanged on cross-examination and was consistent with the affidavit to the complaint, which the defense introduced into evidence.

█ As the defense bears the burden of showing standing to contest the search of 214 South Fourth Street, we find that only Sculco, as a threshold matter, has met this burden. We do not find under the circumstances that Borelli had a legitimate or reasonable expectation of privacy in that house. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Rakas*, 439 U.S. at 133–34, 99 S.Ct. 421 (quotations and citations omitted). As the *Rakas* court went on to write:

[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Id.* at 134, 99 S.Ct. 421 (citations omitted).

█ As a defendant must show that his reasonable, personal, expectation of privacy has been violated in order to prevail in the matter of standing, *see United States v. Salvucci*, 448 U.S. 83, 86–87, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), it is clear that Borelli does not have standing to contest the search of 214 South Fourth Street. His Fourth Amendment rights have not been violated by the search of the home that, based upon our findings of fact, he did not even spend any significant time in, nor did he sleep over. In fact, there is uncontroverted testimony that Borelli was not even present at the time the search was conducted. However, as we have decided that Sculco has cleared this initial hurdle, we shall now move the discussion along to the next issue.

## B. Probable Cause and Exigent Circumstances for Entry

Probable cause demands only an "assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). As the Supreme Court explains:

In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Id.* at 231, 103 S.Ct. 2317 (*quoting Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

In sum, "probable cause is a fluid concept ... [which is] not readily, or even usefully, reduced to a neat set of legal

rules." *Gates*, 462 U.S. at 232, 103 S.Ct. 2317. The Supreme Court thus affirmed the totality of the circumstances approach to this inquiry. Clearly, the task of assessing whether probable cause exists is not rocket science; rather, it is within the province of a "reasonable and prudent" person to make such determinations.

■ We find that the officers were reasonable in their belief that probable cause existed to enter 214 South Fourth Street. The uncontradicted evidence that the officers were not in their usual patrol area and were unfamiliar with the home in question negates any thought that they used the situation which arose on May 13, 1999 as an excuse or ruse to gain entry to a known "drug house". We are also struck by the great restraint that the police showed before they finally felt that they must enter the home. Even when they believed that a burglary was in progress they did not enter until they looked through the open window and saw the broken door latch and ransacked room. This, coupled with the open window, flight of four males from the home when the police approached, admission of two males that they were fleeing from the police, inability of these males to give the full name of the owner of the home, and probability that the initial person in blue who fled was a lookout, clearly gave rise to probable cause in the eyes of trained police officers and exigent circumstances. The inability to contact anyone in the home heightened the concern.

In addition, there is case law that deals with similar situations to the case at bar, which we believe buttresses our holding that the entry by the officers into the premises is supported by probable cause and exigent circumstances as a matter of law. Because the officers reasonably believed under the circumstances that a burglary was in progress, we find that probable cause and exigent circumstances existed. *See, e.g., Reardon v. Wroan*, 811 F.2d 1025, 1029 (7th Cir.1987) (*holding* that exigent circumstances justified warrantless entry where officers were faced

with a call reporting burglary in progress); *United States v. Singer*, 687 F.2d 1135, 1144 (8th Cir.1982) (*holding* that exigent circumstances justified warrantless entry where it seemed apparent that a burglary was in progress), *affirmed in relevant part*, 710 F.2d 431 (1983) (en banc). We believe that these cases stand for the proposition that exigent circumstances will be found to exist, whether or not a burglary is *actually* in progress, as long as a police officer reasonably believes a burglary is being carried out.

Police are entitled to make a warrantless entry into a home where "exigent circumstances" are present. The Supreme Court has, through its rulings, indicated that generally, there are exigent circumstances present where evidence is in danger of being destroyed, a suspect is likely to disappear, or there is a threat to the safety of officers or the public. *See, e.g., Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (evidence in imminent danger of destruction); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (safety of officers in jeopardy); *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (officers in hot pursuit of a suspect); *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (suspect likely to flee). We also note that we are to look to the "totality of the circumstances" when reviewing an officer's evaluation of the existence of exigent circumstances. *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.1973).

Further, we must not allow our perfect hindsight to control the decision. Instead, we must decide only whether the officer's determination was objectively reasonable at the time in question, based on the reasonably discoverable information available to the officer at the time. *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir.1995). In the case at bar, it is not difficult for us to conclude that the officer was reasonable in determining that exigent circumstances were present, based on all of the evidence.

*See* Part II, *supra*. As *Singer* stated, "[i]t would defy reason to suppose that [the officers] had to leave the area and secure a warrant before investigating, leaving the *putative* burglars free to complete their crime unmolested." *Singer*, 687 F.2d at 1144 (emphasis supplied). "It is only 'unreasonable' searches and seizures that the fourth amendment forbids." *Id.*

Further, a recent Supreme Court decision lends support to the officers' initial follow-through after their witnessing the male dressed in blue running at great speed from a street corner into 214 South Fourth Street. *See Illinois v. Wardlow*, — U.S. ——, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). In *Wardlow*, the Supreme Court's majority held that "unprovoked flight upon noticing the police" created a reasonable suspicion such that the police could conduct an investigative stop, including a protective pat-down search for weapons, without violating the Fourth Amendment.

Although in the case at bar we find that, under the circumstances, the evasive behavior of the male dressed in blue created in the officers a reasonable suspicion which would have permitted them to conduct an investigative stop, including a pat-down search for weapons, this issue is moot because the officers did not manage to detain him or talk to him before he entered 214 South Fourth Street. We note further that a reasonable suspicion can ripen into probable cause. *See United States v. Dotson*, 49 F.3d 227, 230 (6th Cir.1995).

■■■ By this reasoning, we believe that the officers in the instant case acted properly in their efforts to contact the person who had fled from them into what they reasonably believed was an abandoned house.[6] Furthermore, the two officers learned nothing from trying the front door and looking in the mail slot. The only thing that resulted from the officers' following the male dressed in blue was that

the officers were in front of the house at 214 South Fourth Street when persons fled from the rear of the home. The officers had every right to be in front of the home on a public sidewalk, whether they were pursuing a reasonable suspicion or not.

## C. Warrantless Searches

Although the officers in this case are the local Reading police, the validity of searches and seizures in our court is governed by federal law and not state law. *United States v. Rickus*, 737 F.2d 360, 364 (3d Cir.1984).

### 1. Plain View

■■■ Items of evidence spotted in plain view may properly be seized, so long as there are also exigent circumstances and probable cause exists to believe that the items in question are evidence of a crime or its contraband. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). Thus, it was proper for the officers, who were in the home pursuant to probable cause and exigent circumstances, to take control of the 9mm handgun and the plastic bag with a white substance in it (that the officers reasonably believed was a controlled substance), both in the vicinity of Sculco, as well as other items of evidence spotted in plain view elsewhere in the home. *See also Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

In *Horton*, the Supreme Court held that even evidence found other than through inadvertence was excepted from the warrant requirement of the Fourth Amendment, so long as three conditions were satisfied: (1) the officer was not in violation of the Fourth Amendment "in arriving at the place from which the evidence could

---

**6.** It appears that under such circumstances, the officers may not have needed a search warrant, although the issue is moot because at this point, they did not yet enter or search

the premises. *See, e.g., United States v. Sledge*, 650 F.2d 1075, 1079 (9th Cir.1981); *United States v. Brazel*, 102 F.3d 1120, 1148–49 (11th Cir.1997).

be plainly viewed," *id.* at 136, 110 S.Ct. 2301; (2) the evidence's "incriminating character must also be immediately apparent", *id.* at 137, 110 S.Ct. 2301 (internal quotations and citations omitted); and (3) the officer must "have a lawful right of access" to the evidence in question, *id.*

In the case at bar, the police have satisfied all three of the requirements above. The officers were in 214 South Fourth Street based on probable cause and exigent circumstances, as described, *supra.* The officers' collective experience made the incriminating nature of this evidence immediately apparent. As Officer Olivieri testified at the suppression hearing, he recognized that the substance in the bag near Sculco appeared to be a controlled substance. *See United States v. Benish,* 5 F.3d 20, 25 (3d Cir.1993). Thirdly, because the evidence was in plain view and due to the presence of exigent circumstances, the officers had a lawful right of access to such evidence.[7]

## 2. Subsequent Voluntary Search of Home

 "A search undertaken pursuant to voluntary consent is not unconstitutional." *United States v. Kikumura,* 918 F.2d 1084, 1093 (3d Cir.1990). The presence of Sculco in bed on the premises, coupled with his assertion that no one else was allowed on the premises, the fact that Officer Olivieri knew him, and the fact that the officers were told that "Tony" and "Fat Tony" lived there by others, were sufficient to cause the officers to reasonably believe that the defendant possessed common authority over the premises and could authorize a search. The search conducted pursuant to such an authorization is valid even if it turns out a defendant lacked such authority. *Illinois v. Rodriguez,* 497 U.S.

177, 185–86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Thus, after the initial discovery of drugs and a firearm in the vicinity of Sculco, his voluntary consent to search ("you can search if you want.") vitiated the need for a search warrant. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

 The Fourth Amendment generally prohibits entering a person's home without a warrant, whether to make an arrest or to search for specific objects. *Illinois v. Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). However, the prohibition "does not apply ... to situations in which voluntary consent has been obtained, either from the individual whose property is searched ... or from a third party who possesses common authority over the premises...." *Id.*

 Very clearly, then, warrantless searches may be conducted where a suspect has consented voluntarily. Further, to determine whether voluntary consent has been given, an objective, reasonableness, standard is employed. It does not matter whether a suspect actually consented, so long as a reasonable police officer would have believed that he had. As the Supreme Court in *Rodriguez* explains:

> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.

*Id.* at 186, 110 S.Ct. 2793 (*quoting Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). All that the Fourth Amendment requires is that

**7.** We find the *Horton* court's footnote on this point helpful:

> This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect

> may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.

*Horton,* 496 U.S. at 137, n. 7, 110 S.Ct. 2301 (internal quotations and citations omitted).

the law enforcement official decide the issue of consent in a reasonable manner.

 Under the totality of the circumstances, the officers were reasonable in concluding that Sculco had voluntarily consented. We find that Sculco's consent was given intelligently, in the absence of duress or coercion, express or implied, and was unequivocal. Sculco's conduct also confirms the validity and voluntariness of the search. Sculco, although sleeping when the officers first arrived, woke up almost immediately after the officers entered the room where he was found asleep; he instantly recognized Officer Olivieri from their past business dealings ("Sal?", Sculco exclaimed, upon seeing Officer Olivieri standing above him); he did not appear fearful or incoherent. Furthermore, although we believe Sculco gave his consent to search both knowingly and intelligently, one need not waive one's Fourth Amendment rights knowingly or intelligently. *Schneckloth,* 412 U.S. at 241, 93 S.Ct. 2041. One need only be acting voluntarily. This, in turn, "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227.

The Fourth Amendment only gives a citizen the right to be free from unreasonable searches, and not the right to be free from any warrantless search or searches in general.

**D. Miranda**

 Although not raised by the parties, we believe that no *Miranda* rights attached in the context of the search of 214 South Fourth Street. Sculco was not entitled to be informed of his right to refuse to consent to the warrantless search of the home. *See, e.g., United States v. Zapata,* 18 F.3d 971, 977 (1st Cir.1994) ("the rule is that a failure to inform a suspect that he is entitled to withhold his consent ..., though relevant to the issue of voluntariness, does not preclude a finding of consent."); *United States v. Lattimore,* 87 F.3d 647, 651 (4th Cir.1996); *United States v. Gonzales,* 79 F.3d 413, 421 (5th Cir.1996) ("there is no absolute requirement that the

government establish that the [suspect] knew [he] could refuse [the search]").

**IV. CONCLUSION**

We find that only Sculco has standing to seek suppression of the evidence seized at 214 South Fourth Street. We also find that the entry by the officers into 214 South Fourth Street is supported by probable cause and exigent circumstances. We further find that Sculco gave his voluntary consent to the search of 214 South Fourth Street and that Sculco was not entitled to a *Miranda* warning. For all these reasons, we find that no constitutional violation was committed and Sculco's Motion is DENIED in its entirety.